# 97 DTA 126

**TRIBUNAL DE CIRCUITO DE APELACIONES
CIRCUITO REGIONAL VI DE CAGUAS/HUMACAO/GUAYAMA
PANEL I**

NIDIA VALLES AMARO, ET AL
Apelados

v.

HOSPITAL LAFAYETTE, ET AL
Apelantes

Núm. KLAN-96-00578

------------------------------------------------------------

NIDIA VALLES AMARO, ET AL
Apelados

v.

HOSPITAL LAFAYETTE, ET AL.
Apelantes

Núm. KLAN-96-00579

San Juan, Puerto Rico, a 5 de junio de 1997

Panel integrado por su presidente, Juez señor Brau Ramírez
y los Jueces Colón Birriel y señora Pesante Martínez

Pesante Martínez, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

El 16 de enero de 1996 el Tribunal de Primera Instancia, Sala Superior de Guayama, dictó sentencia en los casos de epígrafe condenando a los demandados a responder de forma solidaria a los demandantes por los daños sufridos a consecuencia del tratamiento negligente que le brindó el personal del hospital y la doctora asignada a la Sala de Emergencia. Oportunamente la Dra. Nilda Alvarez Martínez y la Asociación Azucarera Cooperativa Lafayette (Hospital Lafayette) presentaron sendos recursos de apelación. Por versar los recursos sobre las mismas controversias de hechos, el 15 de agosto de 1996, ordenamos la consolidación de los mismos. Habiendo examinado el expediente en su totalidad, la exposición estipulada de la prueba oral y con el beneficio de los escritos de ambas partes, modificamos la sentencia en controversia. Veamos.

### I

El 21 de marzo de 1993 la demandante Nidia Vallés se cortó el dedo índice de la mano izquierda mientras mechaba un pedazo de carne con un cuchillo de una hoja con más de 6 pulgadas de largo. Esta se dirigió a la Sala de Emergencia del Hospital Lafayette para recibir tratamiento médico. Según se desprende del testimonio estipulado de la señora Vallés, al llegar ésta al Hospital Lafayette fue atendida por la enfermera Nidia E. Reyes, quien le abrió un expediente médico. La enfermera Reyes le preguntó como ocurrió el accidente, tomó una información general, sus signos vitales e información sobre su historial médico. Acto seguido la enfermera Reyes le pidió que le mostrara la herida por lo que la demandante se quitó el pañal y le mostró su mano izquierda con la palma extendida hacia arriba.

Luego de esto la pasaron donde la enfermera Ramonita Díaz quien le limpió la herida con un

líquido cristalino, gasas y solución de *"betadyne"* y la acostaron en una camilla para que la Dra. Alvarez pasara a evaluar la herida. La demandante declaró que la Dra. Alvarez miró la herida y que utilizó unas pinzas para observar dentro de la misma. Despúes de evaluar la herida le puso anestesia y procedió a suturar la herida con una sola aguja. La demandante declaró que le cogieron diez (10) puntos. De estos, cinco (5) fueron internos y cinco (5) fueron externos. Antes de ser dada de alta la demandante admitió que tanto la Dra. Alvarez como las enfermeras del Hospital Lafayette le dieron instrucciones verbales y escritas sobre cómo limpiar la herida, qué actividades no podía realizar con la mano, qué medicamentos utilizar y le advirtieron que debía regresar en ocho (8) días a remover los puntos de sutura.

Así las cosas, se personó en el consultorio de la Dra. Alvarez el 30 de marzo de 1993, nueve días despúes de la intervención, para que le removiera los puntos. En ese momento la demandante no le hizo ninguna mención a la Dra. Alvarez sobre molestia, dolores, sensaciones o problemas con su dedo. La Dra. Alvarez le examinó la herida y no encontró infección alguna. Esta aceptó que en ese momento podía abrir y cerrar la mano completamente, a pesar de tener su dedo enconado.

La demandante declaró que visitó varios médicos, entre éstos, el Dr. Dávila, Dr. Nazario, Dr. Rosendo Martínez, Dr. Gerena, Dra. Amarylis Silva y la Dra. Linda Ford. Atestó que el Dr. Dávila le recomendó visitar un fisiatra y que no siguió su recomendación. No obstante, negó que el Dr. Dávila le recomendara regresar donde la Dra. Alvarez. También atestó que el Dr. Nazario y un cirujano de la mano le ordenaron unas terapias y que tampoco les hizo caso. Esta aceptó que el tratamiento administrado por la Dra. Ford en la Clínica de Rehabilitación de la Mano le estaba mejorando el movimiento y sensibilidad de la mano, pero también lo dejó.

En junio de 1993 la demandante acudió junto a su compañero consensual al consultorio de la Dra. Alvarez para reclamarle la condición en que se encontraba su dedo. Esta declaró que no le mencionó a la Dra. Alvarez que había recibido tratamiento, los nombres de los médicos, ni que había tenido dolor en el dedo.

La demandante declaró que sólo se reunió en dos (2) ocasiones con su perito el Dr. Boris Rojas y que no le informó a éste que una enfermera le había limpiado la herida y que la Dra. Alvarez le auscultó la herida con unas pinzas. Tampoco le mencionó que había visitado otros médicos y que cuando fue donde la Dra. Alvarez para remover los puntos de sutura, ésta podía abrir y cerrar la mano completamente.

En relación a los daños sufridos declaró que siente dolor, no tiene movimiento en su dedo y tiene aprehensión por la apariencia de su dedo. Esta continúa trabajando como maestra y realizando las tareas de su hogar. El co-demandante Héctor Montañez declaró que sus daños consistían en haber tenido que mapear, fregar, bañar al niño y tender ropa; todo ello por la condición de su compañera. Anteriormente, le ayudaba en las tareas domésticas, pero ahora le ayuda más.

La demandante presentó como perito médico al Dr. Rojas, quien ejerce la neurología clínica en el San Juan Health Center y también trabajaba en el Mepsi Centre en dicha capacidad. Según surge de la exposición estipulada, éste declaró que evaluó a la demandante transcurridos siete meses desde la cirugía menor realizada a la demandante por la Dra. Nilda Alvarez. Cuando éste examinó a la demandante la condición de su dedo ya era irreversible, por lo que no la refirió a otro médico. Este entiende que la demandante tiene un 18% de incapacidad que se comprende en un 8% de incapacidad física y un 10% atribuible a su condición mental. A tenor con las guías de incapacidad, para todos los efectos prácticos, el dedo de la demandante se encuentra amputado. La demandante sufrirá de por vida de causalgia menor, que es un término que se utiliza para describir un dolor de origen neurológico a consecuencia de una laceración de un nervio. Cuando el dedo se toca el dolor se intensifica.

Este declaró que era bien importante saber si a la demandante le habían limpiado la herida, inspeccionado la herida del dedo, utilizado una sola aguja, haberle brindado tratamiento postcirugía y suministrado instrucciones sobre el cuidado de la herida por parte del personal médico y de enfermería que la atendió. El Dr. Rojas también declaró que para determinar si existen problemas con los nervios o tendones se le pide al paciente que extienda y cierre el puño, si puede hacerlo no hay problemas. Atestó que si se hubiese hecho una prueba de flexión y extensión se hubieran percatado del problema.

Adujo que para quedar un dedo como quedó el dedo de la demandante tiene que haberse afectado, nervios, tendones y vasos sanguíneos. Catalogó el expediente médico como uno descuidado.

También declaró que un médico no debe responder por daños si el paciente no regresa dentro de un término razonable al médico o institución que lo atendió para cortarse los puntos de sutura y evaluarse la herida. Si al momento de cortarse los puntos la demandante podía abrir y cerrar la mano completamente y no informó de ningún problema al personal médico y paramédico que la atendió en la sala de emergencia no había responsabilidad por impericia. Este aclaró en su declaración que abrir la mano no quiere decir necesariamente que estiró el dedo lesionado.

La prueba de la parte demandada consistió en los testimonios de la Dra. Alvarez Martínez, las enfermeras Nydia Esther Reyes y Ramonita Díaz, el Dr. Montalvo y la Sra. Medina Lago. La parte demandada, una vez presentada la demanda, no pudo hacerle un examen físico a la demandante por lo que no presentaron prueba pericial al respecto. De la exposición estipulada surge que la Dra. Nilda Alvarez Martínez ejerce la medicina en Puerto Rico desde 1980 y que tiene catorce (14) años de experiencia trabajando en salas de emergencia. Señaló que a base de la experiencia en la Sala de Emergencia del Hospital de Area de Guayama, allí se atienden por turnos alrededor de 110 pacientes, y por lo menos ocho (8) de éstos son pacientes con heridas similares a la de la demandante. En relación a los hechos en controversia declaró que antes de comenzar a suturar la herida le pidió a la demandante que le relatara como ocurrió el accidente y utilizando una fenestrada, especie de toalla con un agujero en el área donde se va intervenir, procedió a explorar la herida. Acto seguido, separó los bordes de la herida para determinar la profundidad. Esta observó que no había músculos o tendones lesionados ni cuerpos extranos por lo que decidió cerrar la misma. Las heridas externas se cierran con unos hilos llamado Dermalón y Etilón. El único que había disponible en la sala de emergencia era el Dermalón. Estos hilos no se absorben en la piel.

Antes de poner la anestesia le pidió a la demandante que hiciese los movimientos de extensión y flexión de su dedo y mano para descartar lesiones a los tendones y nervios en la mano. La Dra. Alvarez arguyó que si hubiera cogido puntos internos con el Dermalón la herida nunca hubiera cicatrizado y se habría enrojecido o irritado. No refirió a la demandante a otro médico especialista porque a su juicio ésta no necesitaba otro tratamiento. En el juicio declaró que ella no fue quien le cortó los puntos a la demandante.

La enfermera Nidia Esther Reyes declaró en síntesis que ella fue quien cumplimentó el expediente médico a la demandante y le preguntó sus datos personales y la forma en que ocurrió el accidente. Atestó que observó a la demandante quitarse el pañal y hacer movimientos de flexión y extensión. También mencionó que la práctica en la Sala de Emergencia es que una enfermera trabaja el expediente médico y otra asiste al facultativo. Ese día la asistente de la Dra. Alvarez fue la enfermera Ramonita Díaz.

La enfermera Ramonita Díaz declaró que la demandante llegó con la mano envuelta en un pañal y procedió a descubrir la mano y a limpiar la herida con una solución salina llamada *"Betadyne"*. Esta observó cuando la Dra. Alvarez observó la herida y volvía a limpiarla. Al observar la misma sólo se veía el tejido graso. Atestó que la Dra. Alvarez le ordenó a la señora Vallés realizar los movimientos de extensión y flexión. Inmediatamente la Dra. Alvarez procedió a aplicar la anestesia y a suturar la herida con una sola aguja. Luego de ésto, se le brindó una receta de antibiótico por boca y una crema antibiótica, instruyeendoseele cómo utilizarlos. Dichas instrucciones fueron tanto verbales como escritas. No recordaba que la demandante regresara a cortarse los puntos.

El Dr. Raúl Montalvo declaró que la Dra. Alvarez tenía credenciales para realizar cirugías menores. Finalmente testificó la Sra. Angela Medina Lago quien declaró que estuvo presente cuando la demandante le reclamó a la Dra. Alvarez por la condición de su dedo y oyó cuando la doctora le preguntaba quién le había cortado los puntos. Acto seguido, la Dra. Alvarez la refirió donde un cirujano de mano.

Ante este marco fáctico y luego de adjudicar credibilidad y sopesar la prueba documental obrante en el expediente, el foro de instancia dictaminó que la señora Vallés mitigó los daños sufridos, y que la Dra. Alvarez y el Hospital Lafayette fueron negligentes por lo que debían responder solidariamente

por los daños causados y les condenó a pagar la cantidad de $55,000 por los daños sufridos a la señora Vallés y $5,000 por los daños sufrido por su compañero el señor Héctor Montañez.

Inconforme con dicho dictamen apelan ante nos alegando en síntesis que el Tribunal de Primera Instancia erró al aquilatar la prueba y conceder una suma excesiva en daños, indemnización que no guarda proporción con la prueba presentada.

De otra parte los demandados-apelantes arguyen que la verdadera causa de la lesión se debió a la negligencia de la señora Vallés al sujetar con una mano un pedazo de carne mientras que con la otra cortaba la misma. También aducen que la señora Vallés actuó negligentemente al esperar hasta el noveno día para remover los puntos de sutura y al no informarle a la Dra. Alvarez que tenía problemas con su dedo. Además, recalcan que ésta visitó varios médicos, pero nunca terminaba los tratamientos.

Por los fundamentos que más adelante habremos de expresar, modificamos la sentencia emitida por el Tribunal de Primera Instancia, Sala Superior de Guayama. Determinamos que la demandante con su negligencia contribuyó a que se produjeran los daños por ella sufridos y en su consecuencia procedemos a reducir la indemnización concedida en un cincuenta por ciento (50%) correspondiente a su grado de negligencia.

## II

De entrada reiteramos que en nuestra jurisdicción, como norma general, un tribunal apelativo no intervendrá con la apreciación de la prueba hecha por el Tribunal de Primera Instancia en ausencia de error manifiesto, prejuicio, pasión o parcialidad. *Orta v. Padilla Ayala*, ___ D.P.R.___ (1995), op. de 8 de febrero de 1995, **95 J.T.S. 21**, pág. 668; *Rodríguez Oyola v. Machado Díaz,* ___ D.P.R. ___ (1994), op. 3 de junio de 1994, **94 J.T.S. 82**, pág. 12008. No obstante, una apreciación errónea de la prueba no tiene credenciales de inmunidad frente a la función revisora de este Tribunal. Véanse, *Rivera Pérez v. Cruz Corchado,* 119 D.P.R. 8, 14 (1987); *Vélez v. Srio. de Justicia,* 115 D.P.R. 533, 545 (1984); *Vda. de Morales v. De Jésus Toro,* 107 D.P.R. 826, 829 (1978).

La responsabilidad civil por mala práctica en la medicina debido a la impericia o negligencia de un facultativo surge del Artículo 1802 de nuestro Código Civil, 31 L.P.R.A. sec. 5141 que dispone que el *"que causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado".* *Soto Cabral y otros v. E.L.A.,* ___ D.P.R. ___ (1995), op. de 21 de abril de 1995, **95 J.T.S. 49**, pág. 813. Para que exista responsabilidad civil bajo dicho articulado tienen que concurrir los siguientes elementos: un acto médico culposo o negligente, un daño real y un nexo causal entre el daño sufrido médico. ■ Del mismo modo, un hospital que brinda servicios de salud con un personal que no actúa con la debida diligencia podrá también generar una acción bajo el Art. 1803 de nuestro Código Civil, 31 L.P.R.A. sec. 5142, y ser responsable por los actos negligentes de sus médicos y enfermeras cuando dichos actos u omisiones causen un daño real. *Soto Cabral y otros v. E.L.A., Ibid.* Véase también, *Núñez v. Cintrón,* 115 D.P.R. 598 (1984).

Entendemos por daño real *"aquel menoscabo material o moral que sufre una persona ya en sus bienes vitales naturales, ya en su propiedad o en su patrimonio causado en contravención a una norma jurídica y por el cual ha de responder otra."* *Santini Rivera v. Serv. Air, Inc.,* ___ D.P.R. ___ (1994), op. de 12 de septiembre de 1994, **94 J.T.S. 121**, pág. 182 citando a *García Pagán v. Shiley Caribbean,* 122 D.P.R. 193 (1988). ■ Por consiguiente, los daños reclamados pueden ser de naturaleza tangibles o intangibles. En los casos de daños intangibles se les asignará un valor pecuniario a los daños emocionales, sufrimientos y angustias mentales sufridos por el promovente. *Santini Rivera v. Serv. Air., Inc., Ibid,* pág. 183.

Conforme a lo antes expuesto no sólo la persona que sufre el daño directamente tiene derecho a reclamar por los daños morales recibidos sino que toda aquella persona vinculada por lazos de parentezco, afecto o cariño con la víctima puede reclamar una indemnización por los sufrimientos y angustias mentales que ha sufrido a consecuencia de los daños que le ocasionaron directamente a su pariente o amigo. *Santini Rivera v. Serv. Air., Inc., Ibid,* pág. 184.

En relación a la culpa o negligencia por parte de los facultativos y personal de salud de los hospitales se entenderá por culpa *"la omisión de la diligencia exigible mediante cuyo empleo podría*

*haberse evitado el resultado dañoso".* C. Rogel Vide, *La Responsabilidad Civil Extracontractual,* Ed. Civitas, 1976, pág. 90. Dicha diligencia es la que cabe esperarse de un buen padre de familia. A diferencia de la culpa que requiere la ejecución de acto positivo que causa un daño, la negligencia es una omisión que produce el mismo efecto. *Toro Aponte v. E.L.A.,* ___ D.P.R. ___ (1997), op. de 31 de marzo de 1997, **97 J.T.S. 18,** pág. 627.

La doctrina elaborada en Puerto Rico en torno a las normas mínimas de atención médica al amparo del Art. 1802 establece que se espera que el médico que ofrece sus servicios profesionales brinde a sus pacientes la atención, cuidado y destrezas que estén acordes con los modernos medios de comunicación, enseñanza y estado de la ciencia y prácticas prevalecientes en la medicina satisfaciendo de esta manera las exigencias generalmente reconocidas por su profesión médica. *Santiago Otero v. Méndez,* ___ D.P.R. ___ (1994), op. de 25 de marzo de 1994, **94 J.T.S. 38**, pág. 11706; *Ramos Robles v. García Vicario,* ___ D.P.R. ___ (1993), op. de 20 de diciembre de 1993, **93 J.T.S. 167**, pág. 11,397.

Dentro de los servicios que ofrecen los hospitales en nuestra comunidad se encuentran los servicios de emergencias médicas. *"Éstos servicios de emergencias médicas se distinguen precisamente porque consisten de primeros auxilios que deben ofrecerse en un breve período de tiempo a una persona que teme que su vida o estado de salud está en peligro... (cita omitida). Al ofrecer el servicio, se supone que el personal médico primero determine si el paciente tiene una emergencia médica y, de concluir que sí, suministre el tratamiento que sea necesario para estabilizar su estado de salud y lo prepare para referirlo para cuidado adicional en otro lugar".* Flores Ramírez v. Maldonado, ___ D.P.R. ___ (1995), op. de 27 de junio de 1995, **95 J.T.S. 89,** pág. 1002. El tratamiento recibido en la salas de emergencia también tiene que cumplir con los modernos medios de comunicación, enseñanza y estado de la ciencia y prácticas prevalecientes en la medicina reconocidas por la profesión. *Ibid.* Cuando un paciente acude a la sala de emergencia y es dado de alta *"se le deben proveer instrucciones claras sobre la atenciones que debe recibir en su hogar y las circunstancias que requieren que regrese a la sala de emergencia para tratamiento adicional". Ibid,* pág. 1003.

Por otro lado, existe una presunción de que el médico ha ejercido un grado razonable de cuidado y ha brindado un tratamiento adecuado. *Ramos Robles v. García Vicario, supra.* Es por ello, que en los casos de impericia médica le corresponde al demandante demostrar con preponderancia de la prueba que el tratamiento médico o la ausencia de un tratamiento adecuado fue el factor que con mayor probabilidad causó el daño alegado por el paciente. En consecuencia, en la parte demandante recae el peso de demostrar que el tratamiento médico suministrado no fue el correcto y que no es por mera especulación o conjetura que llegó a la conclusión de que el acto negligente del facultativo es la causa del daño sufrido. *Soto Cabral y otros v. E.L.A., supra,* pág. 815; *Santiago Otero v. Méndez, supra; Castro Ortiz v. Municipio de Carolina,* ___ D.P.R. ___ (1994), op. de 7 de diciembre de 1993, **94 J.T.S. 17,** pág. 11,529.

Ahora bien, cabe señalar que el Art. 1802 también dispone que la *"imprudencia del perjudicado no exime de responsabilidad, pero conlleva reducción de la indemnización".* Esta adición a dicho articulado crea lo que conocemos como la doctrina de negligencia comparada y fue adoptada en nuestra jurisdicción por disposición de la Ley Núm. 28 de 9 de junio de 1956. *Quiñones López v. Manzano Pozas,* ___ D.P.R. ___ (1996), op. de 25 de junio de 1996, **96 J.T.S. 95**, pág. 1313 citando a H.M. Brau del Toro, *Los Daños y Perjuicios Extracontractuales en Puerto Rico,* 2da ed., **Publicaciones JTS, Inc.,** 1986. Según Brau del Toro:

*"Conforme a esta doctrina, la que impera al presente en Puerto Rico, la negligencia concurrente o contribuyente del demandante (y la asunción de riesgo de éste), sirve para mitigar, atenuar o reducir la responsabilidad pecuniaria del demandado, pero no para eximir totalmente de responsabilidad a éste.*

*Se ha dicho que esta norma tiende a individualizar las indemnizaciones por daños, colocando rigor económico en las partes conforme a la proporción de su descuido o negligencia. Requiere que en todos los casos, el juzgador, además de determinar el monto de la compensación que corresponde a la víctima, determine la fracción (o la percentila) de responsabilidad o negligencia que corresponde a cada parte, y reduzca la indemnización del demandante de conformidad con esta distribución de*

*responsabilidad." Ibid,* pág. 1314.

A tales efectos es importante discutir si la demandante contribuyó con su conducta a agravar el daño sufrido. Como sabemos, una persona actúa negligentemente cuando falta al debido cuidado que impone la ley. Esto quiere decir, que no prevee o anticipa las consecuencias racionales de sus actos o la omisión de un acto, como lo haría una persona prudente y razonable bajo las mismas circunstancias. *Ramos v. Carlo,* 85 D.P.R. 353, 358 (1962). *"Así pues, el actor habrá incurrido en el quebrantamiento de su deber de cuidado si anticipó o debió anticipar el peligro de daños...si se concluye que un hombre prudente y razonable hubiese podido anticipar tales consecuencias."* H.M. Brau del Toro, *supra,* pág. 184. Aclaramos que el deber de previsibilidad no se extiende a todo peligro imaginable sino a preveer aquel daño que es probable que ocurra. Véase, *Vélez Rodríguez v. Amaro Cora,* ___ D.P.R. ___ (1995), op. de 10 de-abril de 1995, **95 J.T.S. 38,** pág. 757.

En resumen, *"para determinar la negligencia que corresponde a cada parte en casos de negligencia comparada es necesario analizar y considerar todos los hechos y circunstancias que mediaron en el caso, y particularmente si ha habido una causa predominante."* (Ennegrecido nuestro) H.M. Brau del Toro, *supra,* pág. 412.

Asimismo, hemos reconocido *"que el derecho a ser compensado por daños no puede derrotarse meramente por el carácter especulativo que en alguna medida supone el cómputo de daños".* *Agosto Vázquez v. F.W. Woolworth & Co.,* ___D.P.R. ___ (1997), op. de 13 de mayo de 1997, **97 J.T.S. 56,** pág. 950. Sabemos que la estimación de los daños no es una tarea fácil, pero el juzgador tiene el deber de evaluar la prueba y otorgar una justa compensación basada en la misma evitando de esta manera que se desvirtúe el propósito del Art. 1802 de indemnizar un daño dándole un aspecto punitivo a la norma. ■ *Ibid.* A su vez, un tribunal apelativo no deberá intervenir con la valorización de los daños realizada por el foro de instancia a menos que las cuantías concedidas sean ridículamente bajas o exageradamente altas. *Agosto Vázquez v. F.W. Woolworth & Co., Ibid,* pág. 951; *Cotto Morales v. Ríos,* ___ D.P.R. ___ (1996), op. de 17 de abril de 1996, **96 J.T.S. 56,** págs. 996-997; *Sanabria v. E.L.A.,* ___ D.P.R. ___ (1993), op. de 17 de febrero de 1933, **93 J.T.S. 24,** pág. 10411. Recordemos que no renunciamos a nuestra función revisora cuando existe prueba en el expediente que sostiene la modificación de la cuantía. *Urrutia v. A.A.A.,* 103 D.P.R. 643, 647-648 (1975).

Por último, queremos recalcar que cuando se trata de prueba pericial y documental los tribunales apelativos están en la misma posición que los tribunales de instancia para evaluar y llegar a sus propias conclusiones de derecho. *Ramos Robles v. García Vicario, supra.* Tampoco, *"debemos ceder a la tentación de sustituir el criterio de los peritos médicos por el nuestro, a base de un estudio a nivel apelativo de la literatura disponible."* *Santiago Otero v. Méndez, supra,* pág. 11709.

Examinada la ley y la jurisprudencia aplicable al caso de marras pasamos a adjudicar las controversias ante nuestra consideración.

### III

En el caso de autos, la demandante alegó que la condición en que quedó su dedo se debió exclusivamente al diagnóstico y tratamiento negligente suministrado por la Dra. Alvarez. A tales efectos, presentó el testimonio del Dr. Boris Rojas quien declaró que al momento de recibir la visita de la señora Vallés, o sea siete (7) meses después del accidente, ya la condición de su dedo índice era irreversible. Este declaró que para el dedo quedar en la condición en que estaba tenía que haberse afectado, nervios, tendones y vasos sanguíneos. Señaló que antes de suturarse una herida como la sufrida por la demandante el facultativo tiene que pedirle al paciente que haga unos ejercicios de flexión con la mano para determinar si hay problemas con los nervios o tendones. Este aclaró que abrir la mano no necesariamente implica que extendió el dedo lesionado. Además, declaró que una limpieza adecuada al área de la herida hubiera reflejado claramente la condición del dedo debido al contraste de colores que existen, ya que los nervios son amarillentos, los tendones son blancos y las arterias rojas.

El foro de instancia determinó que la causa de que el dedo índice se deformara como lo hizo se debió a la negligencia de la Dra. Alvarez al no percatarse que la lesión alcanzó al tendón y al proceder a suturar la herida cuando lo que debió haber hecho fue referir a la demandante a un cirujano

especialista en manos. No le mereció credibilidad la prueba ofrecida por los demandados a los efectos de que la Dra. Alvarez y el personal de salud que se encontraban en la sala de emergencia el día de los hechos cumplieran con el tratamiento exigido por la profesión médica. Este entendió que la Dra. Alvarez erró en su diagnóstico y en el tratamiento administrado.

Nuestra jurisprudencia concibe el error en el diagnóstico como una defensa o eximente de responsabilidad, pero para su aplicación el facultativo tiene que haber efectuado todos los exámenes necesarios y haber hecho un esfuerzo honesto para llegar a un diagnóstico correcto. *Castro Ortiz v. Municipio de Carolina, supra,* pág. 11529. A la luz de la prueba creída por el Tribunal de Primera Instancia, no encontramos evidencia suficiente que nos llevara a concluir que la Dra. Alvarez hizo todo lo posible dentro de los parámetros de su profesión para realizar un diagnóstico correcto. Según el expediente médico de la Sala de Emergencia la Dra. Alvarez se tomó sólo diez (10) minutos en atender a la demandante, en limpiar la herida, poner anestesia y coger diez (10) puntos de sutura. El expediente médico fue catalogado como uno sumamente corto y descuidado. El Tribunal *a quo* concluyó que la Dra. Alvarez no hizo exámenes de flexión y extensión a la demandante cuando la examinó. Las alusiones que se hacen en la prueba en lo relativo al movimiento de la mano no constituyen los ejercicios de flexión y extensión que se supone se realicen con el dedo lesionado. La co-demandada no examinó la herida con el cuidado y detenimiento requerido. Si lo hubiese hecho se hubiese percatado que la lesión era más seria y profunda de lo que diagnosticó y hubiese estado en posición de determinar si habían tendones, ligamentos o nervios seccionados. Aunque el hospital tenía disponible un cirujano, la Dra. Alvarez no solicitó una consulta a dicho cirujano para que fuese un especialista el que revisara la magnitud y gravedad de la cortadura. Esta prueba mereció entero crédito de parte del Tribunal; con su apreciación no habremos de intervenir. En consecuencia resolvemos que la Dra. Alvarez incurrió en impericia médica al realizar un acto médico negligente causándole un daño a la señora Vallés.

No obstante, diferimos con el dictamen del foro de instancia en cuanto a que la única causa eficiente de los daños sufridos por la señora Vallés se debió al tratamiento negligente brindado por la Dra. Alvarez y el personal asignado a la sala de emergencia del Hospital Lafayette. La señora Vallés recibió instrucciones verbales y escritas por parte de la Dra. Alvarez y del personal de salud del Hospital Lafayette de cómo cuidar la herida y de acudir al consultorio de la Dra. Alvarez en ocho (8) días para remover los puntos de sutura. Esta acudió al noveno día y no le mencionó a la Dra. Alvarez que sufriera alguna molestia.

Un hombre prudente y razonable sabe que un médico tiene que tener un cuadro claro de cuáles son todos los síntomas que presenta un paciente para poder dar un diagnóstico correcto. La señora Vallés debió informarle a la Dra. Alvarez que tenía problemas con su dedo para que ésta a tiempo pudiera darle un tratamiento o referirla a un especialista. El propio perito de la demandante declaró que de no haber informado algún cambio o problema al momento de cortarse los puntos no había responsabilidad por parte del personal médico y paramédico que la atendió en la sala de emergencia del Hospital Lafayette.

Además, de la prueba presentada surge que la demandante visitó a otros médicos pero no terminaba los tratamientos. A pesar de reconocer que el tratamiento ofrecido en la Clínica de la Mano le estaba ofreciendo una mejoría, nunca lo concluyó. Tampoco siguió el consejo del Dr. Dávila de regresar donde la Dra. Alvarez para explicarle su situación. Al así actuar incurrió en negligencia, ya que demostró una gran falta de cuidado y diligencia para tratar su condición. La condición de su dedo se agravó por la actitud asumida por la señora Vallés.

Resolvemos que la parte demandada cumplió con su obligación de demostrar que en el presente caso existen circunstancias particulares que hacen meritorio que este tribunal en busca de la justicia modifique las cuantías concedidas por concepto de daño. *Agosto Vázquez v. F.W. Woolworth & Co., supra; Toro Aponte v. E.L.A., supra,* pág. 629; *Quiñones López v. Manzano Pozas, supra,* pág. 1315.

A su vez, la parte demandada menciona en su escrito de apelación que la cuantía concedida a los demandantes no están en conformidad con nuestro ordenamiento jurídico. Esta entiende que la cuantía concedida en el caso de marras es excesivamente alta. En respuesta mencionamos que estamos conscientes que en casos de daños resulta provechoso examinar nuestro acervo jurisprudencial. Sin

embargo, no podemos olvidar que cada caso tiene sus circunstancias particulares por lo que la valorización de los daños debe circunscribirse a los hechos específicos del caso. *Agosto Vázquez v. F.W. Woolworth & Co. supra*, pág. 950; *Toro Aponte v. E.L.A., supra*; Quiñones *López v. Manzano Pozas, supra.*

En el caso de autos, la señora Vallés no sólo va a tener un dedo deforme de por vida sino que sufrirá un dolor continuo, aunque no severo. Cada vez que ésta toque un objeto sufrirá un dolor de origen neurólogico por la laceración del nervio. En el caso del co-demandante se demostró que este estuvo preocupado por la salud de la demandante y que la situación en su hogar se ha visto alterada por la incapacidad de su compañera para realizar algunas tareas. En conclusión resolvemos que las cuantías concedidas a los demandantes por el Tribunal de Primera Instancia sólo deben reducirse en un cincuenta porciento (50%) que sería el correspondiente a la negligencia atribuida a la demandante.

Por los fundamentos que anteceden, se modifica la sentencia apelada, a los efectos de asignarle a la demandante Nidia Vallés un 50% de negligencia comparada. Se rebaja tal porción de la indemnización a ella concedida por el Tribunal de Primera Instancia. En relación al co-demandante Héctor Montannez modificamos la cuantía original por considerarla exageradamente alta a $1,000 y así modificada se le reduce el cincuenta porciento (50%) equivalente a la negligencia de la demandante.

Lo acordó el Tribunal y lo certifica la Secretaria General.

Aida I. Oquendo Graulau
Secretaria General

### ESCOLIOS 97 DTA 126

**1.** Véase, también, como ilustración: *Miranda v. E.L.A.*, ___ D.P.R. ___ (1994), op. de 7 de diciembre de 1994, **94 J.T.S. 152;** *Ramos Robles v. García Vicario,* ___ D.P.R. ___ (1993), op. de 20 de diciembre de 1993, **93 J.T.S. 167;** *Rivera Jiménez v. Garrido & Co.,* ___ D.P.R. ___ (1993), op. de 13 de diciembre de 1993, **93 J.T.S. 158.**

**2.** Véase las siguientes referencias citadas en *Santini Rivera v. Serv. Air, Inc., supra*; J. Santos Briz, *La Responsabilidad Civil,* 2da ed., Madrid, Ed. Montecorvo, 1977, pág. 126; M. Albaladejo, *Comentarios al Código Civil y Compilaciones Forales,* Madrid, Ed. Edersa, 1984, t. XXIV, pág. 156; H.M. Brau, *Los Daños y Perjuicios Extracontractuales en Puerto Rico,* 2da ed., San Juan, **Publicaciones J.T.S.**, 1986, Vol.1, Cap. VIII, pág. 427.

**3.** En relación al carácter resarcitorio del Art. 1802, véase también, *Riley v. Rodríguez Pacheco*, 119 D.P.R. 762, 804 (1987); *Odriozola v. Cosmetic Dist. Corp.*, 116 D.P.R. 485 (1985); *Atiles v. McClure,* 87 D.P.R. 865 (1963); *Vda. de Valentín v. E.L.A.,* 84 D.P.R. 112 (1961).